DAVIES TURNER & Co. *v.* UNITED STATES (No. 4905) [1]

United States Court of Customs and Patent Appeals, December 13, 1957

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Edward N. Glad* of counsel) for appellant.

*George Cochran Doub*, Assistant Attorney General, *Richard E. FitzGibbon*, Chief, Customs Section (*Richard H. Welsh*, trial attorney, of counsel), for the United States.

[Oral argument October 8, 1957, by Mr. Glad and Mr. Welsh]

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON (retired), Associate Judges

WORLEY, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, Abstract 60191, which overruled the importer's protest and sustained the collector in assessing certain merchandise with duty at the rate of 22 per centum ad valorem under the provision for bent-wood furniture in paragraph 412 of the Tariff Act of 1930, as modified by the Presidential Proclamation relating to the Mexican Trade Agreement, T. D. 50797. The importer, appellant, contends

---

[1] C. A. D. 669.

the merchandise should be assessed at 20 per centum ad valorem, as furniture wholly or in chief value of wood, not specially provided for, under the same paragraph, as modified by the General Agreement on Tariffs and Trade, T. D. 51802.

The pertinent portions of the paragraphs read:

Paragraph 412, as modified by T. D. 50797:

| Tariff Act of 1930 paragraph | Description of Article | Rate of Duty |
|---|---|---|
| 412 | Bent-wood furniture, wholly or partly finished, and parts thereof_____ | 22% ad valorem |

Paragraph 412, as modified by T. D. 51802:

| Tariff Act of 1930 paragraph | Description of Article | Rate of Duty |
|---|---|---|
| 412 | Furniture, wholly or partly finished, and parts thereof, wholly or in chief value of wood, and not specially provided for: | |
| | Chairs_____ | 20% ad valorem |
| | Other furniture_____ | 12½% ad valorem |
| | Parts of any of the foregoing_____ | 20% ad valorem |

This controversy involves the same issues and parties as an earlier case decided by the United States Customs Court, First Division, 32 Cust. Ct. 329, C. D. 1622, which was not appealed. The record in that case has been incorporated.

Since the "bent-wood" furniture classification is obviously more specific than "furniture, etc." the only issue is whether the merchandise is "bent-wood" furniture in the tariff sense. No contention is made that the term has a commercial meaning differing from its common meaning.

The importation originally included several types of furniture, but the appeal is limited to chairs resulting from two distinct manufacturing processes. In one process, known as "ribboning," the elements are formed by making a number of parallel saw cuts in the wood to be bent, inserting strips of wood combined with glue in the saw cuts, bending the wood by hand or air pressure, and clamping it in a form until the glue is set. In the other process, known as "laminating," strips of wood, glued on both sides, are laminated under pressure and simultaneously bent to the desired form, then dried.

The parties agree that bent-wood furniture was first made in Vienna, Austria, more than a hundred years ago by a process which involved

subjecting solid pieces of wood to steam or boiling water, thus rendering them pliable, bending to the desired shape until dried, after which they retain the bent shape. It is agreed that furniture made in such manner was the only "bent-wood" furniture known when the Tariff Act of 1930 was enacted, and that the ribboning and laminating processes were not developed until several years later.

The Customs Court held that *at the time of the passage of the Tariff Act of 1930* "the common meaning of the term 'bent-wood' had application to furniture made of solid, as distinguished from laminated, wood parts, which parts were bent by steam or hot water; that, *subsequently*, furniture made by the laminating process *did become known* to the trade and commerce of this country; that the common meaning of the term 'bent-wood' *then included such merchandise;* and that, by reason of the well-settled rule as to future coverage of tariff provisions, the laminated furniture was embraced by the tariff provision for 'bent-wood furniture.' " (Italics ours.)

The court emphasized its reliance on the subsequent meaning of the term "bent-wood," rather than on its meaning in 1930, in the following language:

We have examined the definitions and matter contained in the dictionaries, encyclopedias, tariff summaries, and tariff hearings, cited by plaintiff, and *believe that the later ones,* that is, those *subsequent in date to 1930* or the time when furniture such as that at bar first became known to the trade and commerce of the United States, *do not limit the terms "bent-wood" or "bent-wood furniture" to articles, the parts of which are of solid wood made pliable by steam or hot water.* (Italics ours.)

While we unquestionably agree that the 1930 meaning would not include the instant merchandise, we do not think the decisions of this and other courts support the conclusion that the later meanings, as distinguished from that prevailing in 1930, are applicable.

This case involves two well-established principles of customs law, one, that the meaning of an *eo nomine* designation in a tariff act must be determined as of the date of enactment of the act, *Smillie & Co.* v. *United States,* 12 Ct. Cust. Appls. 365, T. D. 40520; *United States* v. *O. Brager-Larsen,* 36 C. C. P. A. (Customs) 1, C. A. D. 388, and cases there cited; the other, that tariff acts are made for the future as well as the present, and will embrace merchandise which was not known to commerce at the time of their enactment. *United States* v. *Paul J. Downing et al.,* 16 Ct. Cust. Appls. 556, T. D. 43294; *Newman* v. *Arthur,* 109 U. S. 132, 27 L. Ed. 883.

While it might appear superficially that those principles could, on occasion, be conflicting, a careful study of the decisions does not support such a view. The meaning of *eo nomine* provisions is to be determined as of the date of enactment but, when so determined, that meaning will embrace all subsequently created articles which fall within it. Tariff acts, therefore, are made for the future in the

sense that they embrace articles not in existence at the time of enactment, but the meaning of words used in such acts is fixed at the time of enactment and does not fluctuate as the meaning of words might subsequently vary.

That distinction was clearly set forth in the *Smillie* case as follows:

The rule [that the meaning of an *eo nomine* provision of a tariff act is that which it has at the time of enactment] of course, does not operate to exclude articles which are not known at the time of the passage of the act, but which come into being later. *As to all such articles the statute will be held to apply if the article possesses an essential resemblance to the ones named in the statute in those particulars which the statute established as the criteria of the classification.* (Italics ours.)

The decision in the *Downing* case, relied on by the Customs Court, cites and reaffirms the *Smillie & Co.* decision. The *Downing* decision held that certain leather was classifiable as shoe leather where it was used for that purpose at the time of importation, even though such leather was not used for shoes when the Tariff Act was enacted. However, we do not think that holding was based on any subsequent change in meaning of the words used in the act, but upon an application to the new leather of the meaning which those words originally had.

It is true that definitions subsequent to the date of enactment of the provision being interpreted are sometimes considered by the courts, as in *United States* v. *O. Brager-Larsen,* cited by the Government. It appears, however, such definitions are referred to primarily for such light as they may throw on the meaning of the term under consideration at the time the act was passed. Thus in the *O. Brager-Larsen* case it was stated the meaning of the term there under consideration "has not changed from 1903 up to and including the date hereof." It was further expressly stated that the meaning of the term "must be determined as of the date of the enactment of the tariff act."

No decision has been cited, and we have found none, holding that where a term has changed in meaning after the passage of the act in which it appears, the later, rather than the earlier meaning will prevail.

Accordingly, the issue here is whether the term "bent-wood" furniture would have been understood as including ribboned or laminated furniture of the kind at bar if such furniture had been in existence in 1930.

While some of the definitions prevailing in 1930 contain broad language, it seems clear that paragraph 412 was not intended to include *all furniture* which contained any piece of wood which had been bent in any manner. Thus paragraph 405 of the 1930 Act provides for furniture in chief value of willow and, as pointed out by the Customs Court in *Transatlantic Shipping Co.* v. *United States,* 63 Treas. Dec. 1067, T. D. 46460, it would appear that provision would be practically

meaningless if "bent-wood" furniture should be construed as including, without limitation, all furniture having any part made of wood which has been bent in any manner, since willow furniture "must, of necessity, have had certain of its parts bent."

Moreover, it would seem reasonable to suppose that Congress, by employing a hyphen in the term "bent-wood," must have intended to restrict the meaning of that term to the type of furniture known by that name at that particular time, rather than to broaden it to include all types of furniture which contained wood that was literally bent.

Testimony of several witnesses was introduced reflecting their understanding of the term "bent-wood" and its application to the instant merchandise. We agree with the Customs Court that such testimony is conflicting and can be accorded little weight. It is noted, however, that even the Government witness, who was of the opinion the merchandise could properly be called "bent-wood," admitted that "for identification purposes" it was given the trade name "bentply."

On the record here, we think the meaning of the term "bent-wood," at the time of enactment of the Tariff Act of 1930, supports the conclusion of the Customs Court that the instant merchandise would not have been eligible for admission under that paragraph. However, we fear we would be ignoring, or at least weakening, the well established doctrine that tariff acts are to be interpreted in light of their meaning at the time of their enactment, if we were to sustain the conclusion below that subsequent changes in meaning of the language used in tariff acts are to prevail in the judicial process of ascertaining Congressional intent. Under such circumstances it is necessary to *reverse* the judgment of the United States Customs Court and to *remand* the cause for further proceedings consistent with the views expressed herein.

JACKSON, J., Retired, recalled to participate.